**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| MOHAMMAD SABEEHULLAH )<br>and NABIL KHAN, individually and )<br>on behalf of all others similarly situated, )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>FAIRLIFE, LLC, MIKE McCLOSKEY, and )<br>SUE McCLOSKEY, )<br> )<br>Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs bring this Complaint against Defendants, and in support thereof state:

### NATURE OF THE ACTION

1.  This case seeks to hold Defendants liable for engaging in a massive consumer fraud involving the sale of milk products. Defendants advertised, promoted, and sold a variety of milk products at premium prices justified solely by the representation that the milk was obtained from dairy cows that receive "extraordinary" care. That was false. Fair Oaks Farms, run by defendants Mike and Sue McCloskey, abused and tortured the dairy cows and young calves on the farm. Undercover video exposed the sickening treatment of these animals—treatment that one hopes is far worse than the treatment of dairy cows and calves on any other dairy farm that produces and sells milk at a non-premium price. Plaintiffs were deceived into purchasing Defendants' products.

### PARTIES

2.  Plaintiff Mohammad Sabeehullah ("Mr. Sabeehullah" or "Plaintiff Sabeehullah") is a citizen of Indiana. Mr. Sabeehullah is willing to pay a premium price to buy from companies that humanely treat the animals used to produce their products. At least once during the Indiana Class

1

Period, Plaintiff Sabeehullah purchased a Fairlife ultra-filtered milk product. Throughout the Indiana Class Period, Fairlife advertised on its label that it provided "extraordinary" care for the dairy cows that produced the milk. Mr. Sabeehullah purchased this product because he believed and relied on this representation. Mr. Sabeehullah was injured in fact and lost money because of the false representation. Mr. Sabeehullah stopped purchasing this product after learning of Defendants' inhumane treatment of the dairy cows that produced the milk.

3.   Plaintiff Nabil Khan ("Mr. Khan" or "Plaintiff Khan") is a citizen of California, residing in San Diego. Mr. Khan is willing to pay a premium price to buy from companies that humanely treat the animals used to produce their products. At least once during the California Class Period, Plaintiff Khan purchased Fairlife ultra-filtered milk product. Throughout the California Class Period, Fairlife advertised on its label that it provided "extraordinary" care for the dairy cows that produced the milk. Mr. Khan purchased this product because he believed and relied on this representation. Mr. Khan was injured in fact and lost money because of the false representation. Mr. Khan stopped purchasing this product after learning of Defendants' inhumane treatment of the dairy cows that produced the milk.

4.   Prior to moving to California, Mr. Khan also resided in Indiana during the Indiana Class Period. At least once during the Indiana Class Period, Plaintiff Khan purchased a Fairlife ultra-filtered milk product. As previously stated, throughout the Indiana Class Period, Fairlife advertised on its label that it provided "extraordinary" care for the dairy cows that produced the milk. Mr. Khan purchased this product because he believed and relied on this representation. Mr. Khan was injured in fact and lost money because of the false representation. Mr. Khan has stopped purchasing this product after learning of Defendants' inhumane treatment of the dairy cows that produced the milk.

5.   Defendant Fairlife, LLC ("Fairlife") is a Delaware corporation headquartered in Chicago, Illinois. Fairlife manufactures, advertises, sells, and markets various milk products nationwide, including in Indiana. Fairlife's principal source of milk is its dairy plant at Fair Oaks Farms, located in Fair Oaks, Indiana. Fairlife is owned by Select Milk Producers Inc. and the Coca-Cola Company and is distributed by Coca-Cola Refreshments.

6.   Defendants Mike McCloskey and Sue McCloskey, residents of Indiana, are the owners and operators of Fair Oaks Farms and are co-founders of Fairlife and of Select Milk Producers Inc. Ms. McCloskey developed the ultra-filtered process to remove the lactose from the milk to create what they brand as "ultra-filtered milk." The McCloskey's devised the fraudulent marketing scheme for Fairlife and are responsible for both the false representations and the animal abuse that occurs at Fair Oak Farms. Defendants Mike and Sue McCloskey act as spokespersons for Fairlife milk products and make a personal "promise," signed under their own names, on the product labels that are the core of the fraudulent marketing scheme, including the promise that Defendants provide "extraordinary care and comfort for [their] cows." Defendants Mike and Sue McCloskey have promoted the fraudulent marketing scheme on Fairlife's website and on Fairlife's social media platforms.

7.   At all relevant times, each Defendant acted in concert with, with the knowledge and approval of, and/or as the agent of the other Defendants within the course and scope of the agency, regarding the acts and omissions alleged.

JURISDICTION AND VENUE

8.   This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because this case is pled as a class action, the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and class members are citizens of a different state than Defendants.

9.   This Court has personal jurisdiction over Defendants because Mike and Sue McCloskey are residents of the State of Indiana and Fairlife is registered to do business in and in fact conducts substantial business in the State of Indiana.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

BACKGROUND FACTS

## I.   Consumers Are Willing to Pay a Price Premium for Animal Well-being

11. Meat and dairy manufacturers have begun making representations about animal welfare on product labels to propel more sales or to justify charging higher prices. The reasoning is simple: consumers deeply care whether their food comes from animals that were humanely treated and received a high level of care and are willing to pay a price premium for food sourced from humane farms. Defendants made claims that cows receive "extraordinary care and comfort" and their "promise" that "exceptional care [is] taken every step of the way" for this reason – to charge inflated prices and increase unit sales of their milk products.

12. A common interpretation of a Humanely Raised and Handled product, perceived by a reasonable number of consumers, is that a product is produced and handled in such manner that it upholds a reasonable degree of virtuous principle, as it relates to the welfare of the animal subject to the reference, if the label implies such notion.

1.   For instance, the American Humane Association conducted a survey with 2,634 consumers and found that: (1) 95.21 percent of the consumers believe a product that is labeled humanely raised referred to the "better treatment of animals", (2) 74 percent of the consumers would be "very willing" to pay an increased amount for such products, and (3) of that 74 percent, 34 percent were

4

willing to pay 10-20 percent more, (4) while 28 percent would be willing to pay 20-30 percent more for humanely raised products.[1]

2. In 2014, a survfcey by the American Humane Association of more than 5,900 consumers found that: (1) 92.6 percent of the participants felt that it was "very important" to buy humanely raised products, (2) 89.6 percent of consumers were "extremely interested" in supporting the humane treatment of farm animals, and (3) only 0.7 percent were either not interested or felt that the humane treatment of farm animals did not concern them.[2]

3. According to the 2018 Power of Meat Survey: (1) humanely-raised products significantly influence consumers to purchase their product, as opposed to conventional products that do not have such claims, (2) more than 65 percent of consumers aware of the humanely raised claim on a product were reported to feel more inclined to purchase that product over a conventional product, and (3) 71 percent of Millennials and 64 percent of boomers claimed that they would likely select a humanely raised product over a conventional product.[3]

## II. The Humane Treatment of Cows Is the Basis for Fairlife Milk's Premium Price

4. Defendants exploited consumer desire for dairy products originating from farms that ensure increased levels of animal well-being by making their representations a central premise in their labeling strategy. Defendants executed these actions while methodically mistreating their cows.

5. Defendants' representations are effectively uniform on every label of their milk products.

---

[1]   *See*  https://www.americanhumane.org/app/uploads/2013/08/humane-heartland-farm-animals-survey-results.pdf (last accessed 6/13/19).

[2]   *See*   https://www.americanhumane.org/app/uploads/2016/08/2014-humane-heartland-farm-survey.pdf (last accessed 6/13/19).

[3]   *See*  http://www.meatconference.com/sites/default/files/books/Power_of_meat_2018.pdf  (last  accessed 6/13/19).

6.   All versions of 1.5 Liter milk product labels depict a virtually identical promise to the one directly below:



7.   The label specifically states:

**OUR PROMISE**

We are dairy farmers who **believe in better.®** From our farm in Fair Oaks, Indiana, along with all of our family farm partners, we started **fairlife®** to provide high quality real milk filtered for wholesome nutrition from farms where we take exceptional care at every step.

- **Extraordinary care for our cows**
- **High milk quality standards**
- **Traceability back to our own farms**
- **Pursuit of sustainable farming**

*Mike & Sue McCloskey*

**fairlife®** co-founders, dairy farmers (emphasis in original)

6

8.   Likewise, all versions of 11.5 ounce labels of the milk products are fundamentally identical to the one displayed directly below:



9.   The label specifically states:

**OUR PROMISE**

We provide extraordinary animal care, and we can trace our milk back to the family farms that produced it, so you can confidently enjoy every sip.

*Mike & Sue McCloskey*
**fairlife**® co-founders, dairy farmers (emphasis in original)

10. Directly below the co-founders' signature is an illustration of the "flagship farm in Indiana" where the matter of animal maltreatment occurred.

11. A further example of a 1.5 liter label of the milk product is displayed directly below. The version directly below illustrates the uniform promise that is made on Defendants' milk products,

even with the trivial alteration in product labeling. All Defendants' products make the same fundamental claims as depicted below:



12. The label specifically states:

**OUR PROMISE**

The idea for this one-of-a-kind milk began at our kitchen table over 20 years ago. It was an ambition to provide the world with better nutrition while making the world a better place. Our **fairlife**® family farmers provide high quality, real milk, filtered for wholesome nutrition with exceptional care taken every step of the way.

- **Extraordinary care and comfort for our cows**
- **Exceptional quality milk standards**
- **Traceability back to our farms**
- **Continual pursuit of sustainable farming**

We'd love to have you visit our flagship farm in Indiana so you can see for yourself.
*Mike & Sue McCloskey*
**fairlife**® co-founders, dairy farmers

13. Directly above the co-founders' signature is an invitation to visit their "flagship farm in Indiana" where the animal mistreatment occurred.

14. Directly below the co-founders' signature is an illustration of the "flagship farm in Indiana" where the animal mistreatment occurred.

15. Defendants make an explicit "promise," in large bold lettering on all material labels of the milk products, that they provide "extraordinary animal care" (on the 11.5 once labels) or "extraordinary care and comfort for our cows" (on the 1.5 Liter labels). The "promise" is signed on the milk products' labels by Defendants Mike McCloskey and Sue McCloskey. However, as discussed herein, Defendants' "promise" is a sham. Defendants' cows do not receive "extraordinary care," but are instead methodically abused and ill-treated while they are present at the "flagship farm in Indiana".

**III. Defendants' Representations Are False**

16. Between August and November 2018, an undercover investigator from the Animal Recovery Mission ("ARM"), a nonprofit animal welfare organization founded in 2010, disguised himself as a calf care employee at Fair Oaks Farms. Fundamentally, the actions on behalf of the investigator are warranted due to the explicit invitation located on the labeling of their products, as referenced above.

17. During that time, while undercover, the investigator documented several instances that illustrate the methodical and monstrous ill-treatment of the Defendants' cows that took place at Fair Oaks Farms. Such documents can be located at https://vimeo.com/340769169 (one-and-a-half-hour video) (last accessed 6/13/19) and https://vimeo.com/341672220 (4-minute video) (last accessed 6/13/19).

18. While undercover, the investigator documented (and recorded) observing the following examples of maltreatment "on virtually a daily basis" which were "a matter of routine and practice" at Fair Oaks Farms:

- Calves tortured, kicked, stomped on, body slammed;

- Calves thrown off the side of trucks;

- Calves stabbed and beaten with steel rebar;

- Calves through the dirt by their ears;

- Calves hit in the mouth and face with hard plastic milking bottles;

- Calves kneed in the spine;

- Calves left to die in over 100-degree temperatures;

- Calves provided with improper nutrition;

- Calves denied medical attention;

- Calves experiencing extreme pain and suffering, and in some cases permanent injury and death; and

- Calves that do not survive the torture are dumped in mass graves.

19. The investigator noted that "the abuse is rampant" at the Fair Oaks Farm in Indiana, which customers of the Fairlife product are encouraged to visit, as described above.

20. The following images are an accurate representation of the "care" that Defendants' cows receive:



Dumping Area for Dead Calves



Dead Calves Being Transported



Calf's Head Being Stomped By Full Weight of Adult Man



Calves Left Throughout Summer in 113 Degree Temperature



<u>Calf Being Choked and Thrown into a Trailer</u>



## IV.    Defendants Admit that the Animal Abuse Took Place at Fair Oaks Farm

21. Soon after the release of the video, defendant Mike McCloskey admitted that everything depicted in the video occurred at Fair Oaks Farm in Indiana.

22. Defendant Mike McCloskey admitted that "after closely reviewing the released ARM video," he can confirm that employees at Fair Oaks Farm – the "flagship farm" – were "committing multiple instances of animal cruelty and despicable judgment." Defendant Mike McCloskey stated that he "take[s] full responsibility for the actions seen in the footage, as it goes against everything that we stand for in regard to responsible cow care and comfort."[4] (emphasis added). In other words, while the labels of Defendants' milk products promised "Extraordinary care and comfort for our cows," defendant Mike McCloskey admits that Defendants have failed to live up to that standard by "committing multiple instances of animal cruelty and despicable judgment." Nonetheless, although defendant Mike McCloskey stated he took "full responsibility," he then went on to excuse the animal abuse by blaming a few bad apples, even though the abuse was rampant and known and approved by management at Fair Oaks farms.

---

[4] *See* https://fofarms.com/post/response/ (last accessed 6/14/19).

23. In a video posted to Fairlife website, its Chief Operating Officer Tim Doelman issued a public statement on behalf of Fairlife:

> This week we saw appalling footage of animal abuse at Fair Oaks Farms, one of Fairlife's supplying dairy farms. This was something that never should have happened. It was wrong. Animal care is foundational to Fairlife. We have a responsibility to make sure that the dairy farms that supply our milk uphold the highest and most humane standards. We failed in doing that, and we are truly sorry. But sorry is not good enough, we offer you a commitment to improving practices that we now know were insufficient.[5]

24. Mr. Doelman also admitted in the video that Fairlife conducted only one purportedly unannounced audit per year of its dairy farms.

## V.  Defendants Profited from Their Fraudulent Marketing Scheme

25. As exemplified herein, a clear majority of consumers prefer products that ensure the general well-being of animals that produce such products is a top priority. Therefore, the fraudulent claims displayed on Defendants' product labels are an attempt to elevate product demand, and ultimately accumulate a significant increase in product revenue.

26. In September of 2017, according to Food Navigator-USA, it discovered that: (1) In 2016, Defendants increased their revenue in dollar sales by 79 percent, according to the Fairlife VP of Communications Anders Porter, and (2) that Fairlife had an estimate 76,000 outlets nationwide.[6]

27. According to The Dairy 100 List, it found that: (1) Fairlife generate $200.0 million in sales in 2015, (2) $350.0 million in sales during 2017, and (3) the Fair Oaks Farms was listed as one of the plants contributing to the production of Fairlife products.[7]

---

[5] *See* https://fairlife.com/news/fairlife-statement-regarding-arm-video/ (last accessed on 6/14/19).

[6] *See* https://www.foodnavigator-usa.com/Article/2017/09/12/fairlife-ultra-filtered-milk-sales-surged-79-in-2016 (last accessed 6/14/19).

[7] *See* https://www.dairyfoods.com/2017-Dairy-100-3 (last accessed 6/14/19).

28. In more recent article from Food Navigator-USA in 2019, it was reported that: (1) Fairlife is increasing its "production and distribution" by planning to construct a new $200 million production facility, which (2) the facility is estimated to produce 3 to 4 million pounds of milk each day, and (3) Fairlife sales have increased by 42 percent compared to the previous year.[8]

29. All material increases in revenue and product demand, as allocated above, are a product of deceptive marketing. Thus, consumers who purchased Defendants' products did so based on a fallacy that Defendants claims regarding animal welfare were veracious.

CLASS ALLEGATIONS

INDIANA CLASS

30. Plaintiffs Khan and Sabeehullah bring this action on behalf of themselves and all Indiana residents who purchased Defendants' milk products on or after June 17, 2017 (the "Indiana Class Period") in the State of Indiana, each such person termed as "Indiana Class Member," and all such persons termed the "Indiana Class."

31. Plaintiffs seeks certification under Federal Rule of Civil Procedure 23(b)(2) and (3).

32. Excluded from the Indiana Class are: (a) Fairlife and its employees, principals, affiliated entities, legal representatives, successors and assigns; (b) the judges to whom this action is assigned and any members of their immediate families; and (c) all governmental entities.

33. On information and belief, there are thousands of Indiana Class Members who are geographically dispersed throughout Indiana. Therefore, individual joinder of all Indiana Class Members would be impracticable.

---

[8]*See*  https://www.foodnavigator-usa.com/Article/2019/04/09/fairlife-to-build-200m-production-facility-to-meet-consumer-demand (last accessed 6/14/19).

34. Common questions of law or fact exist as to all Indiana Class Members. These questions predominate over the questions affective only individual Indiana Class Members. These common legal or factual questions include:

   a.   Whether Fairlife provided "extraordinary" care for the dairy cows that produced the milk products;

   b.   Whether Fairlife's "promise" that they provide "extraordinary animal care…so you can confidently enjoy every sip" on the milk products is likely to deceive a reasonable consumer;

   c.   Whether Defendants' representations are unlawful;

   d.   Whether an injunction against Defendants is warranted; and

   e.   The appropriate measure of damages, disgorgement, and restitution.

35. Plaintiffs' claims are typical of the claims of the Indiana Class in that Plaintiffs are consumers who purchased Defendants' milk products in Indiana during the Indiana Class Period. Plaintiffs are thus no different in any relevant respect from any other Indiana Class Member, and the relief sought is common to the Indiana Class.

36. Plaintiffs are adequate representatives of the Indiana Class because their interests do not conflict with the interests of the Indiana Class Members they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation. Plaintiffs and their counsel will adequately protect the interests of the Indiana Class.

37. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Indiana Class Member will be relatively small, especially given the relatively low cost of the milk products at issue compared to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct. Thus, it would be virtually impossible for Indiana Class Members individually to effectively redress the wrongs done to them. Moreover, even if the Indiana Class Members could

15

afford individual actions, which they cannot, it would still be far less desirable than efficient class-wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

38. In addition, the Indiana Class may be certified because Defendants have acted or refused to act on grounds generally applicable to the Indiana Class, thereby making appropriate declaratory and equitable relief with respect to the Indiana Class.

### CALIFORNIA CLASS

39. Plaintiff Khan brings this action on behalf of himself and all California residents who purchased Defendants' milk products on or after June 14, 2014 (the "California Class Period") in the State of California, each such person termed a "California Class Member," and all such persons termed the "California Class."

40. Plaintiff Khan seeks certification under Federal Rule of Civil Procedure 23(b)(2) and (3).

41. Excluded from the California Class are: (a) Fairlife and its employees, principals, affiliated entities, legal representatives, successors and assigns; (b) the judges to whom this action is assigned and any members of their immediate families; and (c) all governmental entities.

42. On information and belief, there are thousands of California Class Members who are geographically dispersed throughout California. Therefore, individual joinder of all California Class Members would be impracticable.

43. Common questions of law or fact exist as to all California Class Members. These questions predominate over the questions affective only individual California Class Members. These common legal or factual questions include:

16

a. Whether Fairlife provided "extraordinary" care for the dairy cows that produced the milk products;

b. Whether Fairlife's "promise" that they provide "extraordinary animal care…so you can confidently enjoy every sip" on the milk products is likely to deceive a reasonable consumer;

c. Whether Defendants' representations are unlawful;

d. Whether an injunction against Defendants is warranted; and

e. The appropriate measure of damages, disgorgement, and restitution.

44. Plaintiff Khan's claims are typical of the claims of the California Class in that Plaintiff Khan is a consumer who purchased Defendants' milk products in California during the California Class Period. Plaintiff Khan is thus no different in any relevant respect from any other California Class Member, and the relief sought is common to the California Class.

45. Plaintiff Khan is an adequate representative of the California Class because his interests do not conflict with the interests of the California Class Members he seeks to represent, and he has retained counsel competent and experienced in conducting complex class action litigation. Plaintiff Khan and his counsel will adequately protect the interests of the California Class.

46. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual California Class Member will be relatively small, especially given the relatively low cost of the milk products at issue compared to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct. Thus, it would be virtually impossible for California Class Members individually to effectively redress the wrongs done to them. Moreover, even if the California Class Members could afford individual actions, which they cannot, it would still be far less desirable than efficient class-wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties

and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

47. In addition, the California Class may be certified because Defendants have acted or refused to act on grounds generally applicable to the California Class, thereby making appropriate declaratory and equitable relief with respect to the California Class.

### COUNT I: INDIANA DECEPTIVE CONSUMER SALES ACT I.C. § 24-5-0.5
(*on behalf of the Indiana Class*)

48. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

49. Defendants violated Ind. Code § 24-5-0.5-3(a) by engaging in an unfair, abusive, and/or deceptive act of claiming that: Fairlife provides "extraordinary animal care;" "exceptional care [is] taken every step of the way…;" and its cows receive "extraordinary care and comfort. Defendants knew or should have reasonably knowns that said representations were false.

50. Defendants violated Ind. Code § 24-5-0.5-3(b)(1) by making oral, written, and/or electronic representations that the milk products had characteristics and/or benefits it did not have and which the Defendants knew or should have reasonably known that it did not have. More specifically, Defendants claimed that: Fairlife provides "extraordinary animal care;" "exceptional care [is] taken every step of the way…;" and its cows receive "extraordinary care and comfort. Defendants knew or should have reasonably knowns that said representations were false.

51. Defendants violated Ind. Code § 24-5-0.5-3(b)(1) by making oral, written or electronic representations that the milk products were of a particular standard, quality, grade, style, or model, even though said representations were false and the Defendants knew or should reasonably have known that they were false. More specifically, Defendants claimed that: Fairlife provides "extraordinary animal care;" "exceptional care [is] taken every step of the way…;" and its cows receive "extraordinary care and comfort. Defendants knew or should have reasonably knowns that

18

said representations were false.

52. Plaintiffs Sabeehullah and Khan and Indiana Class Members relied on Defendants' misrepresentations.

53. Defendants' deceptive acts were done as part of a scheme, artifice, or device with intent to defraud or mislead and constitute incurable deceptive acts under Ind. Code § 24-5-0.5-1 *et seq.*

54. Plaintiffs Sabeehullah and Khan and Indiana Class Members are entitled to statutory damages, reasonable attorney fees, costs of suit, and an order enjoining Defendants' unlawful practices, and any other relief which the Court deems proper.

**COUNT II: "Unlawful" Business Practices in Violation of the
Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.***
(*on behalf of the California Class*)

55. Plaintiff Khan incorporates the above allegations as if set forth herein.

56. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

57. A business act or practice is "unlawful" if it violates any established state or federal law.

58. California's Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Article 6, § 110660 provides that: "Any food is misbranded if its labeling is false or misleading in any particular."

59. Defendants violated and continue to violate the Sherman Law, Article 6, § 110660, and hence also violated and continues to violate the "unlawful" prong of the UCL, through its "promise" that Fairlife provides "Extraordinary care and comfort for our cows" and "provide[s] extraordinary animal care" on the labels of their milk products.

60. Defendants' identical conduct that violates the Sherman Law also violates the FDCA § 403(a)(1), 21 U.S.C. § 343(a)(1), which declares food misbranded under federal law if its "labeling is false and misleading in any particular." This identical conduct serves as the sole factual basis of each cause of action brought by this Complaint, and Plaintiff does not seek to enforce any of the state law claims raised herein to impose any standard of conduct that exceeds that which is required by FDCA § 403(a)(1).

61. By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

62. Through their unlawful acts and practices, Defendants have unfairly obtained, and continue to unfairly obtain, money from members of the California Class. As such, Plaintiff Khan requests that this Court cause Defendants to restore this money to Plaintiff Khan and all California Class Members, to disgorge the profits Defendants made on these transactions, and to enjoin Defendants from continuing to violate the UCL or violating it in the same fashion in the future as discussed herein. Otherwise, the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### COUNT III: "Unfair" Business Practices in Violation of the
#### Unfair Competition Law ("UCL"), Bus. & Prof. Code. §§ 17200, *et seq.*
(*on behalf of the California Class*)

63. Plaintiff Khan incorporates the above allegations as if set forth herein.

64. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

65. A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

66. Defendants are violating the "unfair" prong of the UCL through their misleading "promise" on the milk products' labels that Fairlife provides "Extraordinary care and comfort for our cows" and "provide[s] extraordinary animal care" when the cows do not receive "extraordinary care and comfort." The gravity of the harm to members of the California Class resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Defendants for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unfair business practices within the meaning of California Business and Professions Code §§ 17200, *et seq*.

67. Through their unfair acts and practices, Defendants have unfairly obtained, and continue to unfairly obtain, money from members of the California Class. As such, Plaintiff Khan requests that this Court cause Defendants to restore this money to Plaintiff Khan and all California Class Members, to disgorge the profits Defendants have made on the milk products, and to enjoin Defendants from continuing to violate the UCL or violating it in the same fashion in the future as discussed herein. Otherwise, the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### Count IV: "Fraudulent" Business Practices in Violation of the
### Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*
(*on behalf of the California Class*)

68. Plaintiff Khan incorporates the above allegations as if set forth herein.

69. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

70. A business act or practice is "fraudulent" under the UCL if it actually deceives or is likely to deceive members of the consuming public.

71. Defendants' acts and practices of promising that Fairlife provides "extraordinary animal care" and that "exceptional care [is] taken every step of the way…" despite the fact that the cows do not receive "extraordinary care and comfort" has the effect of misleading consumers into believing the milk products are something they are not, produced from cows that receive "extraordinary care and comfort."

72. As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiff Khan and Members of the California Class. Specifically, Defendants have been unjustly enriched by the profits they have obtained from Plaintiff Khan and the California Class from the purchases of milk products made by Defendants.

73. Through their unfair acts and practices, Defendants have improperly obtained, and continue to improperly obtain, money from members of the California Class. As such, Plaintiff Khan requests that this Court cause Defendants to restore this money to Plaintiff Khan and all California Class Members, to disgorge the profits Defendants have made on the milk products, and to enjoin Defendants from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future as discussed herein. Otherwise, the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**Count V: False Advertising in Violation of**
**California Business & Professions Code §§ 17500, *et seq.***
(*on behalf of the California Class and the General Public*)

74. Plaintiff Khan incorporates the above allegations as if set forth herein. This claim is brought on behalf of Plaintiff Khan, the California Class, and the general public.

75. Defendants uses advertising on its packaging to sell its milk products. Defendants are disseminating advertising concerning Fairlife's goods that by their very nature are deceptive, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq.* because those advertising representations contained on Fairlife's labels are misleading and deceived, and will continue to deceive, the California Class Members and the general public.

76. In making and disseminating the representations alleged herein, Defendants knew or should have known that the representations were untrue or misleading, and that they acted in violation of California Business & Professions Code §§ 17500, *et seq.*

77. The misrepresentations and non-disclosures by Defendants of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of California Business & Professions Code §§ 17500, *et seq.*

78. Through their deceptive acts and practices, Defendants have improperly and illegally obtained money from Plaintiff Khan and Members of the California Class. As such, Plaintiff Khan requests that this Court cause Defendants to restore this money to Plaintiff Khan and California Class Members, and to enjoin Defendants from continuing to violate California Business & Professions Code §§ 17500, *et seq.*, as discussed above. Otherwise, Plaintiff Khan and those similarly situated will continue to be harmed by Defendants' false and/or misleading advertising.

79. Pursuant to California Business & Professions Code § 17535, Plaintiff Khan seeks an order of this Court ordering Defendants to fully disclose the true nature of their misrepresentations. Plaintiff Khan additionally requests an order requiring Defendants to disgorge their ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendants

by means of such acts of false advertising, plus interest and attorneys' fees so as to restore any and all monies that were acquired and obtained by means of such untrue and misleading advertising, misrepresentations and omissions, and which ill-gotten gains are still retained by Defendants. Plaintiff Khan and the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

80. Such conduct is ongoing and continues to this date. Plaintiff Khan and the California Class are therefore entitled to the relief described below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the Indiana Class and the California Class, and for the claims brought on behalf of the general public, requests an award and relief as follows:

A.  An order certifying that this action is properly brought and may be maintained as a class action, appointing: Plaintiffs Sabeehullah and Khan, as Class Representatives for the Indiana Class; Plaintiff Khan as Class Representatives for the California Class; and Plaintiffs' Counsel as Counsel for the Class;

B.  Statutory damages and treble damages for the Indiana Class under the Indiana Deceptive Consumer Sales Act.

C.  Restitution in such amounts that Plaintiffs and all Indiana and California Class Members paid to purchase the milk products produced by milk cows provided "extraordinary care and comfort", or paid as a premium over alternatives, or restitutionary disgorgement of the profits Defendants obtained from those transactions, for claims for which they are available;

D.  Compensatory damages for claims for which they are available;

E.  Punitive damages for claims for which they are available;

24

F.   A declaration and order enjoining Defendants from advertising its products misleadingly, in violation of Indiana Deceptive Consumer Sales Act, California's Sherman Food, Drug and Cosmetic Law, and other applicable laws and regulations as specified in this Complaint;

G.   An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre- and post-judgment interest;

H.   An order requiring an accounting for, and imposition of, a constructive trust on all monies received by Defendants as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

I.   The requests for relief sought herein as they pertain to the Second Cause of Action do not and shall not be read to exceed the [d]amages and other legal and equitable relief" and "costs and expenses (including attorneys' fees based on actual time expended)" as provided in 15 U.S.C. § 2310(d); and

J.   Such other and further relief as may be deemed necessary or appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action and/or all issues so triable.

Dated: June 17, 2019

Respectfully Submitted,

**Saeed & Little, LLP**
/s/ Syed Ali Saeed
Syed Ali Saeed
18 W. Vermont Street
Indianapolis, Indiana 46204
T: (317) 614-5741
Ali@Sllawfirm.com

**PAUL LLP**
Ashlea G. Schwarz *(pro hac forthcoming)*
Laura C. Fellows *(pro hac forthcoming)*
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
T: (816) 984-8100
Ashlea@PaulLLP.com
Laura@PaulLLP.com

**ATTORNEYS FOR PLAINTIFFS**